Filed 6/15/23  P. v. Edouarzin CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B312551 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA315445-01 |
| LOURDYVES EDOUARZIN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Reversed and remanded with instructions.

Law Offices of Elliott N. Tiomkin and Elliott N. Tiomkin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

A trial court may vacate the criminal conviction of a noncitizen if a preponderance of the evidence establishes that the conviction is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (Pen. Code § 1473.7, subd. (a)(1); *id.*, subd. (e)(1).[1] To establish prejudicial error, a defendant must demonstrate a "reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*); *People v. Espinoza* (2023) 14 Cal.5th 311, 316 (*Espinoza*).)

In 2021, appellant Lourdyves Edouarzin, a Haitian national, filed a motion to vacate his 2010 convictions for computer intrusion access and false impersonation (colloquially, identity theft), enhanced by a loss of over $150,000. He contended defense counsel gave him no advice as to the adverse immigration consequences of his no-contest pleas and admission, and also failed to investigate and negotiate an immigration-neutral plea agreement. He asserted he never would have taken the plea bargain had he known the charges compelled his deportation. After an evidentiary hearing, the trial court denied the motion because Edouarzin submitted no evidence contemporaneous in time with the plea which supported his assertions. Edouarzin now appeals.

We reverse.

---

[1]     Undesignated statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND

## I.   The Convictions

Appellant was born in Haiti and immigrated to the United States 25 years ago when he was 18 years old.  He and his United States citizen wife have a son.  He lost 20 members of his family in the Haitian earthquake and has been supporting many of his remaining family members, including his mother.

On April 10, 2009, the People filed an amended Information in the Los Angeles Superior Court charging appellant with multiple counts of grand theft of personal property (§ 487, subd. (a)); theft (§ 484e, subd. (d)); and identify theft (§ 530.5, subd. (a)).  On January 22, 2010, appellant pled no contest to three counts of computer intrusion access (§ 502, subd. (c)(1)) and two counts of false impersonation (§ 529), which were added to the Information.  He also admitted that the loss was over $150,000 pursuant to section 12022.6, subdivision (a)(2).  The People alleged appellant was part of a sophisticated and highly organized group of people who accessed private information through data aggregators like Choice Point Corporation, Merlin, and Locate Plus, and then opened credit card or bank accounts using the victims' information to steal money, goods, and services.

At the plea hearing on January 22, 2010, appellant was represented by attorney Michael Berry. Before the plea colloquy, counsel advised appellant (who had been in pre-trial detention for three years) that if he pled guilty, he would avoid serving significant prison time and would be released soon.  Mr. Berry did not tell appellant that his plea would result in removal, let alone mandatory removal, from the United States.  Counsel did

not discuss the immigration consequences of the plea with appellant and never asked him about his immigration status.

In advance of the plea hearing, appellant signed a written plea agreement which addressed all the rights he was waiving by virtue of the plea, but did not mention the immigration consequences of the plea. At no time was appellant asked to execute any forms.[2]

When taking the plea, the prosecutor advised appellant of the effect of a no contest plea, including: "[I]f you are not a U.S. citizen, this plea will result in deportation, exclusion from admission or denial of the right of naturalization." Appellant was confused when the prosecutor told him he would be deported because of the plea. Appellant turned to Mr. Berry to confer privately and asked him *sotto voce* what the advisement meant. The proceedings paused. Mr. Berry did not then ask appellant about his immigration status or advise him about the impact of the conviction on his immigration status. Instead, Mr. Berry told appellant to answer yes to the court's questions. After their conversation, appellant did as he was told.

On February 10, 2010, the trial court sentenced appellant to seven years eight months in state prison with credit for time served in accordance with the plea agreement. Appellant served his sentence and has since sustained no other convictions.

---

[2] As part of a guilty or no contest plea, defendants and their counsel typically sign a waiver of rights form and submit it to the court. The form includes an advisement about potential immigration consequences arising from a plea of guilty or no contest. (*In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*), overruled on other grounds by *Mills v. Municipal Court* (1973) 10 Cal.3d 288, 291.)

On March 25, 2011, deportation proceedings were commenced against appellant based on these convictions.

## II.   **2021 Motion to Vacate**

In 2014, appellant moved to vacate his convictions on the ground that his counsel never advised him of the immigration consequences of his pleas. The trial court denied the motion without an evidentiary hearing.

On February 4, 2021, appellant filed the instant motion to vacate his convictions pursuant to section 1473.7. Again he argued he did not understand the immigration consequences of his pleas because counsel had not advised him on the subject, except to tell him it was ok to say yes to the prosecutor's questions. Appellant related the facts set out above and argued he would have rejected the plea had he known it would prevent him from being able to fight deportation as he had been in the United States since 1989, had permanent residency status, and had a United States citizen wife and child.

In support of his motion, appellant submitted his sworn declaration and a declaration from his current counsel who confirmed there was no *Tahl* waiver in the court file and appellant had committed no new offenses since his release from prison.

Mr. Berry also provided a sworn declaration. Mr. Berry stated that he did not recall any specific discussion with his client concerning immigration issues. He knew his client was not a citizen and he did not have an immigration hold; "beyond that, we did not explore his immigration status, family ties, or future prospects for adjustment or relief under immigration law." "The sole focus of the plea bargaining discussion [with the prosecutor] was the amount of jail time. I do not recall any discussion or

5

negotiation with the prosecutor of any alternative charges to which the defendant could plead."

Also attached to the motion were charging documents from the United States Department of Homeland Security underpinning appellant's deportation proceeding based on these convictions, and State Bar documents showing Mr. Berry's disbarment shortly after he represented appellant.

Finally, the People put forth a copy of the written plea agreement which appellant and his counsel signed before the court took the no contest plea. Although the written plea agreement includes several advisements and waivers of rights, it does not address in any way immigration consequences that could or would result from the plea.

III. **The Trial Court's Ruling**

On April 30, 2021, the trial court held a hearing on appellant's motion to vacate. The court remarked that it had "read the entire court file, including the transcript of the plea and the transcript of the sentencing, not what you just put it, but the entire transcript."

Appellant was the sole witness at the hearing. He testified he was 51 years old, which would have made him 40 years old when he entered the no contest plea. He had been represented by Michael Berry for two years and was in pretrial detention for three years. Mr. Berry never once visited him while he was in custody. Most of the time he did not visit him in the courtroom lockup. He would just walk into the courtroom. Right after the earthquake in Haiti and about a week before the plea was taken, Mr. Berry told appellant he was going to try to get a plea offer.

At the plea the prosecutor gave the advisements and asked the questions. When the prosecutor gave the advisement about

6

immigration consequences, appellant asked to speak to his attorney because he had never said "anything about immigration status or any problem that I would have." Mr. Berry knew appellant was from Haiti because Mr. Berry had discussed the earthquake with appellant's sister. Mr. Berry never asked appellant any questions about his immigration status. After the prosecutor's advisement in court, appellant asked Mr. Berry what the prosecutor was talking about. Mr. Berry said, "Don't worry about it" and to answer "Yes" to the question. Mr. Berry said, "Everything is fine. Don't worry about it." Because appellant had spent so much time in pretrial detention, the focus of the plea bargaining was on the length of the sentence to be imposed by the court.

It was only "later on down the road I found out everything that [Mr. Berry] told me it was not correct, it was untrue." Appellant was put into deportation proceedings. At the time of the plea, he was an immigrant applying for citizenship. He was married to a United States citizen with whom he had a United States citizen child. He has lived in the United States for 34 years. When he heard the prosecutor's advisement, he did not understand the meaning of the word "exclusion from admission, denial of right of naturalization or deportation." English is his fourth language, after Creole, Spanish, and French. At the time he was unfamiliar with deportation proceedings and the immigration system and had had no significant involvement in the criminal justice system prior to his plea.

Appellant testified had he known of the mandatory immigration consequences, he would have gone to trial. His only family members are his sister and mother who both live in the

United States. Appellant testified he would have been willing to risk more jail time to avoid the consequences of deportation.

Appellant testified that his attorney advised him to answer "yes" about whether he understood his trial rights. The prosecutor pointed out that he asked to speak with counsel only upon hearing about his probation and parole rights, not the immigration consequences. Appellant stated he did not recall it that way. He started speaking to his attorney about the immigration advisement while the court proceeded on to the next topic of probation and parole before it paused the proceedings. Appellant stated he was not concerned about probation and parole at that time because he had so much credit for time served he believed he would have no parole. He stopped the proceedings to ask his attorney about the immigration consequences, not about parole.

The court then asked appellant about the plea negotiations in the case. The court asked appellant what sentence he agreed to. Appellant answered, "They gave me seven years I believe." The court asked appellant what the People's first offer was. Appellant stated that at the preliminary hearing he was offered a seven-year sentence. His attorney at the time told him that if he did not accept the offer before the preliminary hearing, "they will give me 10 years." Appellant rejected both offers and never made a counteroffer to the prosecutor. By the time of the plea, he had already served three years in pretrial detention.

The trial court denied the motion to vacate, stating: "Judge Pounders questions the credibility of Mr. Berry at the sentencing. Mr. Berry's statements that Judge Pounders stated, among other things, is the stupidest thing he ever heard, questioned the credibility of Berry. I 'm not so sure that this declaration suffices,

8

especially on what Judge Pounders said. And Mr. Berry's statement that he doesn't recall as opposed he didn't say. [¶] Defendant's statement here in court, I find incredible. His memory was very clear as to certain things, as to other things it happened, 11 years ago, he doesn't recall. Specifically when I asked him about the case settlement in this case, he didn't get the case number right. It was seven years, eight months. First he said three years, then he said seven years. He remembered exactly the events as he understood it at the preliminary hearing of the 10 year offer. [¶] The fact is that he faced a maximum exposure of 24 years, eight months. He accepted seven years, eight months. He was given credits at the sentencing that equals 6.142 years, leaving very little time in a sentence that was concurrent with a federal pending charge. [¶] , , , [¶] In this case, it is clear from the record of conviction that the defendant was interested solely in one thing and one thing only. That is serving as little time as possible for this crime and making sure that it wouldn't be in addition to any federal sentence. [¶] I find that the defense has not met their burden. It is clear to me that regardless of any advice of consequences, advice of immigration aspects or anything else that defendant would still have plead solely to get a lesser sentence. [¶] The motion is denied."

Appellant filed a timely notice of appeal.

## DISCUSSION

### I. Applicable Law

Mandatory deportation from the United States is an immigration consequence where a defendant is convicted of a crime deemed an aggravated felony under federal immigration law. (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187–188; 8 U.S.C.

9

§ 1228(c) [aggravated felony is conclusively presumed deportable].)  With respect to appellant's case, an offense involving fraud with a loss in excess of $10,000 in violation of section 12022, subdivision (a)(2) constitutes an aggravated felony. (8 U.S.C. § 1101(a)(43)(M)(i).)

Section 1473.7 authorizes a person to file a motion to vacate a conviction or sentence for any of the following reasons: "The conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence."  (§ 1473.7, subd. (a)(1).)

Effective January 1, 2019, legislative amendments to section 1473.7 afforded a defendant relief under the statute without a showing of ineffective assistance of counsel per the *Strickland*[3] standard.  (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1005; Stats. 2020, ch. 317, §5.)  To establish prejudice, a defendant must show by a preponderance of the evidence that he did not meaningfully understand or knowingly accept the actual or potential adverse immigration consequences of the plea. (*Camacho,* at pp. 1010–1011; see *People v. Mejia* (2019) 36 Cal.App.5th 859, 862 (*Mejia*); see *People v. Martinez* (2013) 57 Cal.4th 555, 565 [defendant may show prejudice by convincing the court that he "would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow"].)  A fact is proved by a preponderance of the evidence if it is more likely than not that the fact is true. (*People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003.)

---

3        *Strickland v. Washington* (1984) 466 U.S. 668.

The key to section 1473.7 is "the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken." (*Mejia*, *supra*, 36 Cal.App.5th at p. 866.) Showing prejudicial error under section 1473.7, subdivision (a)(1) means "demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances." (*Vivar*, *supra*, 11 Cal.5th at p. 529.) Factors relevant to this inquiry include appellant's ties to the United States, the importance appellant placed on avoiding deportation, appellant's priorities in seeking a plea bargain, and whether appellant had reason to believe an immigration-neutral negotiated disposition was possible. (*Id.* at pp. 529–530; *Espinoza, supra*, 14 Cal.5th at p. 320.) Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial. These factors are not exhaustive and no single type of evidence is a prerequisite to relief. (*Espinoza,* at pp. 320–321.)

A defendant must provide objective evidence to corroborate factual assertions. Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced. (*Vivar, supra*, 11 Cal.5th at pp. 530–531.)

Ties to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities. (*Vivar, supra*,

11

11 Cal.5th at p. 530.)  When long-standing noncitizen residents of this county are accused of committing a crime, "the most devasting consequence may not be a prison sentence, but their removal and exclusion from the United States."  (*Id*. at p. 516; *People v. Lopez* (2022) 83 Cal.App.5th 698, 703 (*Lopez*); *Mejia, supra,* 36 Cal.App.5th at p. 872 [compelling evidence of prejudice where the defendant lived in the United States since he was 14 years old, and his wife and child lived here, as well as his mother and siblings].)

II.  **Standard of Review**

In *Vivar*, the California Supreme Court determined the standard of review for section 1473.7 proceedings and endorsed the independent standard of review.  (*Vivar*, *supra*, 11 Cal.5th at p. 524.)  Under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.  (*Id*. at p. 527.)  Independent review is not the equivalent of de novo review.  (*Ibid*.)  An appellate court may not simply second-guess factual findings that are based on the trial court's own observations.  (*Ibid*.)  Factual determinations by the trial court are given particular deference, even though courts reviewing such claims generally may reach a different conclusion from the trial court on an independent examination of the evidence even where the evidence is conflicting.  (*Ibid*.)  Where the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, the trial court and this court are in the same position in interpreting written declarations when reviewing a cold record in a section 1473.7 proceeding.  (*Vivar*, at p. 528.)  It is for the appellate court to ultimately decide, based on its

12

independent judgment, whether the facts establish prejudice under section 1473.7. (*Vivar*, at p. 528.)

III. **Analysis**

A. *Credibility Findings*

We note here that it appears the trial court made two credibility determinations. First, the trial court commented that another judge, Judge Pounders, had commented that defense counsel's remarks at appellant's sentencing hearing were "stupid" and that remark cast doubt on the credibility of defense counsel's declaration in support of the motion. On the contrary. If, indeed, defense counsel made "stupid" remarks at the sentencing hearing, that surely support counsel's declaration that he could not recall giving his non-citizen client immigration advice, surely an uninformed (and possibly "stupid") course of action.

More importantly, we are not bound by the trial court's credibility determination because there was no live testimony from Mr. Berry at the hearing. Before the hearing, current defense counsel advised the court he was unable to subpoena Mr. Berry. He asked for a continuance so he could locate Mr. Berry and subpoena him to testify before the court. Both the prosecutor and the court agreed to submit on the declaration alone rather than continue the hearing for live testimony from Mr. Berry. Under *Vivar,* we are not bound by the trial court's credibility determination where the court did not hear live testimony. (*Vivar, supra*, 11 Cal.5th at pp. 527–528.) We may review the testimony de novo. (*Ibid*.) And, in doing so, we find Mr. Berry's testimony undisputed and consistent with appellant's recollection of events before and at the plea colloquy. Given Mr. Berry's 2013 disbarment, a fact of which we take judicial notice, we find he had no incentive to testify one way or another.

13

The second credibility determination was the trial court's statement that appellant was not credible when he said he was worried about immigration consequences because it was clear to the court that the only thing appellant was worried about, at the time of the plea, was the length of the sentence. We put no stock in this finding as it begs the question. Appellant testified he was unaware of immigration consequences, so those consequences were not an issue for him. Appellant's counsel declared he did no research into immigration consequences and did not inquire about appellant's immigration status, so appellant was not tipped off by counsel that immigration consequences would be a problem he would need to address. Given counsel's admitted inability to recall raising the immigration issue with appellant (although he did admit he had no discussions with appellant about his immigration status), the only consequential issue left on appellant's radar was the length of the sentence. That is, until the prosecutor brought up the subject of immigration consequences at the change of plea hearing. This prompted appellant to immediately inquire of counsel. That was when counsel told him it wasn't an issue and not to worry about it – just say "yes" to the court's questions. In the absence of a pre-existing alert about immigration consequences, and given appellant's already lengthy pretrial detention of three years, appellant's presumed focus on the length of the sentence during plea negotiations makes perfect sense. (*Vivar, supra*, 11 Cal.5th at p. 532 [when ignorant of immigration consequences, rejection of an immigration-neutral plea bargain cannot be seen as evidence that immigration consequences were not defendant's priority],)

14

The court also thought appellant was not credible because he did not correctly answer the court's question about the length of his sentence. The court appeared to believe appellant was selectively remembering only those events that were favorable to him. The transcript does not support the rationale for the court's credibility finding. Appellant stated he had been in pretrial detention for three years, not that the first offer was for three years. He stated the first offer was for seven years and his attorney said it would rise to 10 years after the preliminary hearing. This is uncontradicted by the record. That he told the court he ultimately thought his sentence was seven years, rather than seven years eight months, is too inconsequential to stand as a basis to find his testimony incredible. It is clear from reading the transcript that at some points the court and appellant were talking past each other and, at other points, the court had to rephrase its questions to focus appellant on what information it wanted to get from him.

"The Court: I got a couple of questions. One maybe, two. Not many, sir. What was the case settlement? In other words, what is the sentence that you agreed to?

"The Defendant: Since I was incarcerated for three years.

"The Court: For three years?

"The Defendant: Yes.

"The Court: All right. And that was the sentence that you agreed to?

"The Defendant: No. They gave me seven years I believe.

"The Court: Is that what it was, seven years?

"A. Yes.

"The Court: And was that the first offer that was presented to you?

"A.  It was the first offer given to me in prelim and I didn't take it.  So it was going to go up to 10 [years], so I decided to go for the 10 [years].

"The Court: So you went to 10 [years]?

"A.  I went for 10 [years] on the prelim and basically on prelim we end up trying to do a 995 motion.

"The Court: Yeah.

"A.  And that's the reason why I hire Mr. Berry.

"The Court: Yeah.

"A.  To finish up with my 995 motion and not the attorney that I had before.

"The Court: Yeah.

"A.  So Mr. Berry came into the case and he just sit on it.

"The Court:  All right, listen to my question.  What was the offer that was given to you?  You said it was seven years?

"A.  Correct.

"The Court:  Now how did you get the 10 years?

"A.  No, my previous attorney that I had was telling me if I don't take the plea today, they will give me 10 years.

"The Court: All right.  And you did take the plea?

"A.  I didn't take the plea.

"The Court: So that was a plea that you rejected?

"A.  Correct.

"The Court: Did you make an offer yourself?

"A.  No.

"The Court:  Ever?

"A.  No.

"The Court: All right.  I have no further questions."

We fail to see the basis for the court's unfavorable findings on credibility based on appellant's answers as reported in this transcript.

### B.   *Lack of Advice*

We find the evidence compelling that appellant was not advised about and was unaware of the immigration consequences of his pleas.  Counsel declared he could not recall specific discussions with appellant on the issue.  That Mr. Berry said he could not recall specific discussions is consistent with appellant's surprise when the prosecutor recited the standard section 1016.5 admonition about immigration consequences.  Had appellant and his counsel discussed such consequences, there would have been no reason to pause the proceedings while appellant asked counsel about the meaning of the admonitions.  Apart from the dearth of oral advice, the written plea agreement which appellant signed set out all the rights appellant was waiving by his plea, but did not address immigration consequences.  The absence of a *Tahl* waiver, which itself includes an advisement about potential immigration consequences, is further evidence from which it can be inferred that counsel did not, either in writing or orally, execute his duty as counsel to advise appellant of the adverse immigration consequences arising from the plea.

The importance of counsel's responsibility to give a client a complete advisement of all material adverse immigration consequences cannot be overstated – and it is not excused by official admonitions given during the plea colloquy.  As our Supreme Court has stated: "That defendants have a right to counsel when they undertake the plea evaluation and negotiation specifically provided for in section 1016.5, subdivisions (b) and (d) is not disputed. . . . '[I]t is the attorney, not the client, who is

17

particularly qualified to make an informed evaluation of a proffered plea bargain.' [Citation.] Thus, whether or not the court faithfully delivers section 1016.5's mandated advisements, '[t]he defendant can be expected to rely on counsel's independent evaluation of the charges, applicable law, and evidence, and of the risks and probable outcome of trial.' " (*In re Resendiz* (2001) 25 Cal.4th 230, 240, abrogated on another ground in *Padilla v. Kentucky* (2010) 559 U.S. 356, 370-371.) Thus, a section 1016.5 warning, like the one given here, does not cure bad or nonexistent advice from defense counsel about immigration consequences.

Here the record establishes that Mr. Berry, knowing his client was a Haitian national, gave him no advice whatsoever about the immigration consequences of his pleas.

C. *Prejudice*

Appellant must show prejudice in addition to error. "[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar*, *supra*, 11 Cal.5th at p. 529.) "Reasonable probability" does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. (*People v. Soto* (2022) 79 Cal.App.5th 602, 610.)

Mr. Berry's failure to advise appellant damaged his client's "ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences" of the pleas. (§ 1473.7, subds. (a)(1) & (e)(1).) It is one thing to accept the adverse consequences when you are advised correctly that you have no other options, which could have been the case if Mr. Berry had done his job. Because of

18

counsel's failures, appellant was ignorant of his options and lost the opportunity to make a meaningful and knowing decision about the immigration consequences of the plea.

Appellant's ties to the United States were lifelong. He arrived here with permanent residency status when he was 18 years old. By the time of the plea, he had been in this country for 22 years, unlike the defendant in *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1076, a case relied upon by the trial court, who had been here four and a half years. Another difference between appellant and Bravo is appellant's relationship with his United States-based family. Bravo was convicted of domestic violence and child cruelty against the very family members he cited as his incentive to remain in the United States. (*Id.* at pp. 1067–1068.) Appellant's only two blood relatives besides his wife and child were his mother, whom he was financially supporting, and sister, both of whom lived in the United States. Appellant's long residence in this country, coupled with his resident nuclear and extended family members militate in favor of a finding of prejudicial error. His lengthy and legal United States residence is objective evidence itself of appellant's ties to the United States, an important factor in evaluating prejudicial error because they shed light on a defendant's immigration priorities. (*Espinoza, supra*, 14 Cal.5th at p. 321.) As our high court has stated, appellant's longstanding ties "weigh in favor of finding that he would have considered immigration consequences to be of paramount concern in deciding whether to accept a plea agreement." (*Id.* at p 322.)

Another consideration is whether alternative, immigration-safe dispositions were available at the time of the plea. Factors relevant to this inquiry include defendant's criminal record, the

strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, the district attorney's charging policies with respect to immigration consequences and the existence of comparable offense without immigration consequences. (*Espinoza, supra*, 14 Cal.5th at p. 323; *Mejia, supra*, 36 Cal.App.5th at p. 873.)

Where, as here, a defendant has no extensive criminal record, it may be persuasively contended that the prosecutor might have been willing to offer an alternative plea without immigration consequences. (*Espinoza, supra*, 14 Cal.5th at p. 324.) Also relevant is the prosecutor's willingness to deviate so far from a 24-year maximum sentence to a seven-year eight month sentence. This may represent the prosecutor's assessment of problems of proof after three years of pretrial proceedings, a willingness to give appellant a break given his criminal history, or a focus more on the amount of restitution than on the amount of prison time. In any event, that the prosecutor was willing to deviate significantly from the maximum sentence indicates there was room to negotiate an immigration-neutral disposition that comported with the prosecutor's priorities. (*Id.* at p. 323.)

Interestingly, restitution appears to have been a priority of the prosecutor as it was a requirement of the plea agreement that appellant agree to pay back the losses arising from all counts, not just the losses connected to the counts to which he pled no contest. This focus on restitution is what rendered these offenses a basis for mandatory deportation because the agreement was to admit to an amount of loss over $10,000. Had appellant not admitted this loss over $10,000, deportation would not have been mandatory. (*Nijhawan v. Holder* (2009) 557 U.S. 29, 42 [129 S.Ct. 2294, 2303] [loss amount must be tethered to the

offense of conviction; amount cannot be based on acquitted or dismissed counts or general conduct].)  In this regard, the plea agreement called for a waiver under *People v. Harvey* (1979) 25 Cal.3d 754 (*Harvey*).  Such a waiver allows the court to impose restitution for dismissed offenses to which the defendant has not been convicted.  (*Id*. at p. 758.)  Thus, there was no need for appellant to have formally admitted the loss amount over $10,000.  The amount could have been ordered to be repaid without his formal admission.  The formal admission of the enhancement was unnecessary and served only to make the offenses a basis for mandatory deportation.  Had defense counsel realized the significance of the loss amount as a basis for mandatory deportation, he could have tried to negotiate the admission of the enhancement out of the agreement and the prosecutor would still have been able to argue for the same restitution amounts by proceeding on the *Harvey* waiver alone.

Finally, in denying the motion the trial court noted and relied on the absence of evidence contemporaneous in time with the plea to substantiate appellant's position that he would have rejected the plea bargain had he known of the immigration consequences.  (*Vivar*, *supra*, 11 Cal.5th at p. 530; *Mejia*, *supra*, 36 Cal.App.5th at p. 872.)

This focus on the absence of contemporaneous corroborating evidence as a basis to deny a motion to vacate a plea has been rejected by our Supreme Court since the trial court made its ruling.  In *Espinoza*, the court reiterated that the inquiry under section 1473.7 requires consideration of the totality of the circumstances which necessarily involves case-by-case examination of the record and "no specific kind of evidence is a prerequisite to relief."  (*Espinoza*, *supra*, 14 Cal.5th at p. 325.)

21

The totality of the circumstances support our conclusion that appellant had shown a reasonable probability that had he understood the consequences of the plea, he would have rejected the plea and either gone to trial or sought a different, immigration-neutral disposition. He has been in the United States since 1989 when he arrived at age 18. He arrived with permanent residency status and intended to apply for United States citizenship. He has no remaining familial ties to Haiti as his sister and mother were now in the United States. He has a United States citizen wife and child. He presented a reasonable explanation for his assent when the prosecutor recited the immigration consequences of the plea in that he paused the proceedings to ask his counsel what the advisement was all about and his counsel told him not to worry and "just say yes." He had little familiarity with the criminal justice system, sustaining no other convictions after his no contest plea in this case. Significantly, he immediately filed a motion to vacate his convictions in 2014 when he was placed in deportation proceedings, another event from which we infer the deportation proceedings came as a surprise to him.

We conclude appellant's long and deep ties to the United States, his stated lack of experience with the immigration system here, and the undisputed contemporaneous concern he expressed to counsel about the immigration consequences of the plea sufficiently corroborate appellant's claim that his ability to remain in the United States would have been expressed as a paramount concern had he been advised of the issue. (See *Lopez*, *supra*, 83 Cal.App.5th at pp. 703–704 [" 'the prospect of deportation "is an integral part," and often even "the most important part," of a noncitizen defendant's calculus in

responding to certain criminal charges' "].)  We conclude it is reasonably probable appellant would have rejected the plea agreement had he correctly understood the unfavorable mandatory deportation consequences of the plea.

Exercising independent review, we conclude appellant has carried his burden for section 1473.7 relief.

## DISPOSITION

The order denying appellant's motion to vacate his convictions is reversed.  The matter is remanded to the superior court with directions to grant the motion and allow appellant to withdraw his pleas pursuant to section 1473.7, subdivision (e).

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.